The MARSCHALK COMPANY,
INC., Plaintiff,

v.

IRAN NATIONAL AIRLINES CORP.
and the Government of Iran,
Defendants,

and

United States of America, Intervenor.

No. 79 Civ. 7035 (CBM).

United States District Court,
S. D. New York.

June 11, 1981.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiff; Edward N. Costikyan, Robert S. Smith, Robert E. Bartkus, Harriet Goldberg, New York City, of counsel.

Abourezk, Shack & Mendenhall, P. C., Washington, D. C., for defendants; Thomas G. Shack, Jr., Raymond J. Kimball, Gregory deSousa, Washington, D. C., of counsel.

John S. Martin, Jr., U. S. Atty., S.D.N.Y., New York City, Thomas S. Martin, Acting Asst. Atty. Gen., Dept. of Justice, Civ. Div., Washington, D. C., for intervenor; David J. Anderson, Mark C. Rutzick, Theodore C. Hirt, Washington, D. C., of counsel.

Timothy E. Ramish, Dept. of State, Washington, D. C., Kramer, Levin, Nessen, Kamin & Soll, New York City, for garnishee Bank Melli; Daniel P. Levitt, Greg A. Danilow, New York City, of counsel.

Fenwick, Stone, Davis & West, New York City, for party of interest Bank Saderat Iran; Ronald Abramson, New York City, of counsel.

Rabinowitz, Boudin, Standard, Krinsky & Lieberman, New York City, for garnishee Bank Markazi; Eric M. Lieberman, New York City, of counsel.

## OPINION

KEVIN THOMAS DUFFY, District Judge:

This is another opinion [1] which addresses difficult issues in what has become known as the Iranian assets litigation. It is with a somewhat heavy heart that I undertake to render this decision not only because I find my views are quite different from those of some of my most respected and learned brethren, but more importantly, as an individual, I would prefer to see this sorry chapter of the history of our country finally closed. My duties as a judicial officer, however, compel me to face the difficult issues presented here devoid of such personal considerations.

---

1. It is assumed that the reader is familiar with my previous rulings in these matters. *See New England Merchants National Bank v. Iran Power Generation and Transmission Company*, 495 F.Supp. 73 (1980); 502 F.Supp. 120 (1980); 508 F.Supp. 47 (1980); 508 F.Supp. 49 (1980). References to these rulings in this opinion are intended merely to put matters in context. Those holdings and the reasoning behind them are set out in the prior opinions.

I am asked to decide whether the President was acting within his constitutional and statutory powers when he entered into an agreement with Iran and issued executive orders in order to effect the release of the American hostages. The agreement and the executive orders require the termination or suspension of claims against Iran and its instrumentalities, presentation of those claims to an international claims tribunal, and the nullification of orders of attachment imposed on Iranian assets in the United States.[2]

**2.** The agreement between the *United States and Iran is embodied in the Declaration of the Government of the Democratic and Popular Republic of Algeria.* In the agreement, the parties declared in part that:

GENERAL PRINCIPLES

. . . . .

B. *It is the purpose of both parties,* within the framework of and pursuant to the provisions of the two Declarations of the Government of the Democratic and Popular Republic of Algeria, *to terminate all litigation* as between the Government of each party and the nationals of the other, *and* to bring about the settlement and termination of all such claims through binding arbitration. Through the procedures provided in the Declaration, relating to the Claims Settlement Agreement, the United States agrees to terminate all legal proceedings in United States courts involving claims of United States persons and institutions against Iran and its state enterprises, *to nullify all attachments* and judgments obtained therein, to prohibit all further litigation based on such claims, and to bring about the termination of such claims through binding arbitration.

(emphasis added)

In an executive order issued on January 19, 1981, President Carter ordered that:

(b) All rights, powers, and privileges relating to the properties described in section 1-101 of this Order and which derive from any attachment, injunction, other like proceedings or process, or other action in any litigation after November 14, 1979, at 8:10 a.m. EST, including those derived from Section 535.504 of the Iranian Assets Control Regulations, other than rights, powers, and privileges of the Government of Iran and its agencies, instrumentalities, and controlled entities, whether acquired by court order or otherwise, are nullified, and all persons claiming any such right, power, or privilege are hereafter barred from exercising the same.

On February 24, 1981, President Reagan issued Executive Order No. 12,294 which provides that

The Court of Appeals for this Circuit has directed me to select one of the pending cases and "to join the United States as a party in [that] single case in which the issues raised by the Iranian Agreement and the Presidential Orders are squarely presented and to proceed with confirmation hearings in that case alone." *New England Merchants National Bank v. Iran,* 646 F.2d 779, 784 (2d Cir. 1981) and related cases. I will refer to the difficulties encountered in the selection of that single case later and only to the extent necessary to indicate

Section 1. All claims which may be presented to the Iran-United States Claims Tribunal under the terms of Article II of the Declaration of the Government of the Democratic and Popular Republic of Algeria Concerning the Settlement of Claims by the Government of the United States of America and the Government of the Islamic Republic of Iran, and all claims for equitable or other judicial relief in connection with such claims, are hereby suspended, except as they may be presented to the Tribunal. During the period of this suspension, all such claims shall have no legal effect in any action now pending in any court of the United States, including the courts of any state or any locality thereof, the District of Columbia and Puerto Rico, or in any action commenced in any such court after the effective date of this Order. Nothing in this action precludes the commencement of an action after the effective date of this Order for the purpose of tolling the period of limitations for commencement of such action.

Section 2. Nothing in this Order shall require dismissal of any action for want of prosecution.

Section 3. Suspension under this Order of a claim or a portion thereof submitted to the Iran-United States Claims Tribunal for adjudication shall terminate upon a determination by the Tribunal that it does not have jurisdiction over such claim or such portion thereof.

Section 4. A determination by the Iran-United States Claims Tribunal on the merits that a claimant is not entitled to recover on a claim shall operate as a final resolution and discharge of the claim for all purposes. A determination by the Tribunal that a claimant shall have recovery on a claim in a specified amount shall operate as a final resolution and discharge of the claim for all purposes upon payment to the claimant of the full amount of the award, including any interest awarded by the Tribunal.

. . . . .

some of the processes whereby the selection was made. At this point, suffice it to say, that this case was selected as the one which "squarely presented" the issues for which this litigation was remanded.

This case is somewhat different from those which have been considered by courts in other circuits. *See, e. g., Charles T. Main International, Inc. v. United States,* 651 F.2d 800 (1st Cir. 1981); *American International Group, Inc. v. Islamic Republic of Iran,* 657 F.2d 430 (D.C.Cir.1981); *Security Pacific National Bank v. The Government and State of Iran,* 513 F.Supp. 864 (C.D.Cal.1981); *Unidyne Corporation v. Government or Iran,* 512 F.Supp. 705 (E.D.Va.1981). Each of these cases involved services to be performed in Iran. This case, however, involves a contract whereby the plaintiff, a corporation formed in the United States, rendered advertising services solely in the United States, the object of which services was to obtain a larger share of the relevant United States market for the defendants by enticing United States citizens and others present in the United States to patronize defendant Iran Airlines. This was purely a commercial transaction wholly within the territory of the United States. The attachment obtained by Marschalk was issued by a United States court and levied upon property located in the United States. The attachment was specifically permitted by United States government license. While this fact pattern puts the issues at bar in much sharper focus than those of the other decided Iranian asset cases, the issues of law here are nonetheless identical to those in the other cases.

The plaintiff argues that the President did not have the authority under the Constitution or any statute to terminate or suspend claims or nullify orders of attachment; furthermore, plaintiff contends that the President's actions constitute a taking of private property for a public purpose without just compensation.

The defendants and government's position is that the President was acting within the aggregate of his foreign affairs powers under the Constitution and his powers under the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.* (Supp. III 1979) ["IEEPA"] and that no compensable taking occurred.

### Background

On Sunday, November 4, 1979, some 400 Iranians seized the American Embassy in Teheran, Iran, taking fifty-two American diplomats and other personnel hostage.[3] Support from the mobs nearby, the religious leaders and the Government of Iran escalated a three-day sit-in to an international crisis which would last 444 days.[4]

In response to this crisis and the Iranian threat to withdraw all of its deposits from the United States, President Carter issued Executive Order No. 12,170, 44 Fed.Reg. 67,729 (1979).[5] The order froze all Iranian property within the United States and any interests in such property. The order also directed the Secretary of the Treasury to take the necessary measures to carry out the provisions of the order.

The Secretary promptly promulgated regulations, 31 C.F.R. Part 535, authorizing the maintenance of law suits against Iran, 31 C.F.R. § 535.504(a) (1979),[6] and the imposi-

---

**3.** *New York Times Magazine,* Special Issue, May 17, 1981, at p. 58.

**4.** *Id.* at 55.

**5.** 44 Fed.Reg. 67,729 (1979).

**6.** 31 C.F.R. § 535.504(a) provides:
(a) Subject to the limitations of paragraphs (b) and (c) of this section, judicial proceedings are authorized with respect to property in which on or since the effective date there

has existed an interest of Iran or an Iranian entity.
(b) This section does not authorize or license:
(1) The entry of any judgment or of any decree or order of similar or analogous effect upon any judgment book, minute book, journal or otherwise or the docketing of any judgment in any docket book, or the filing of any judgment roll or the taking of any other similar or analogous action.

tion of attachments on Iranian property located within the United States, 31 C.F.R. § 535.418 (1979).[7]

The events in Iran and the Secretary's regulations opened the litigation floodgates; law suits poured into this and other circuits seeking monetary damages for alleged civil wrongs ranging from the nationalization of private property to the repudiation of executory contracts. By September of 1980, 96 civil actions were pending in this district alone. The damages claimed in these actions amounted to many billions of dollars.

In most of the suits in this court, the plaintiffs obtained *ex parte* orders of attachment pursuant to New York's attachment statute, N.Y.Civ.Prac.Law & R. ["C.P.L.R."] §§ 6201, *et seq.* (McKinney). Under New York law, an *ex parte* attachment order must be confirmed by the court after due notice has been given to the defendants.

Plaintiffs' motions for confirmation of the attachments in the 96 cases before this court were opposed by the Iranian defendants who claimed that their assets were immune from pre-judgment attachment under the Foreign Sovereign Immunities Act,

28 U.S.C. §§ 1602, *et seq.* (1976) ["FSIA"], and the Treaty of Amity, Economic Relations and Consular Rights, Aug. 15, 1955, United States-Iran, 8 U.S.T. 899 ["Treaty of Amity"] between the United States and Iran. The 96 cases were referred to me to resolve the sovereign immunity and other common legal issues.[8]

In an Opinion and Order issued on September 26, 1980,[9] I ruled that, while Iran had not expressly waived its immunity from pre-judgment attachment as set out in the FSIA, Iran's sovereign immunity was unequivocally suspended when the President issued Executive Order No. 12,170, 44 Fed. Reg. 67729 (1979), freezing Iran's assets located in the United States. *New England Merchants National Bank v. Iran Power Generation and Transmission Co.*, 502 F.Supp. 120 (S.D.N.Y.1980). I referred the cases back to the district court judges to determine whether the prerequisites of New York's attachment law had been satisfied.[10]

At this juncture, the parties to the 96 law suits sought certification to the Court of Appeals of a number of questions regarding

---

(2) Any payment or delivery out of a blocked account based upon a judicial proceeding, nor does it authorize the enforcement or carrying out of any judgment or decree or order of similar or analogous effect with regard to any property in which Iran or any Iranian entity has an interest.

(c) A judicial proceeding is not authorized by this section if it is based on transactions which violated the prohibitions of this part. 44 Fed.Reg. 67,617 (1979).

**7.** 31 C.F.R. § 535.418 provides:

The general authorization for judicial proceedings contained in § 535.504(a) includes pre-judgment attachment. However, § 535.-504(a) does not authorize payment or delivery of any blocked property to any court, marshal, sheriff, or similar entity, and any such transfer of blocked property is prohibited without a specific license. It would not be consistent with licensing policy to issue such a license.

44 Fed.Reg. 75,353 (1979).

**8.** At the outset, common problems with service of process and other technical matters were dealt with by me in an opinion issued on June 4, 1980. *New England Merchants National Bank v. Iran Power Generation and Transmission Company*, 495 F.Supp. 73 (S.D.N.Y.1980).

**9.** Prior to the issuance of my September 26, 1980 Opinion, the United States requested an indefinite stay of all district court proceedings. I denied this request, ruling that the government had failed to demonstrate a need for such relief. The 96 law suits against Iran had each been initiated under the aegis of a special license issued by the Secretary of the Treasury. 31 C.F.R. Part 535. No administrative action concerning this license had been taken by the government to stay this litigation. Since the President had the power to suspend the license for a definite and reasonably short period, a court order imposing such a stay simply was not necessary.

**10.** In order to confirm these attachments, a determination must be made of the validity of the attachments on a case by case basis in accordance with state law. Under New York's attachment statute, plaintiff must prove that (i) the attachment is based on proper grounds, (ii) there is a need for continuing the levy and (iii) there is a probability that plaintiff will succeed on the merits of the underlying claim. N.Y.Civ. Prac.Law & R. §§ 6211(b), 6223(b) (McKinney).

the validity of the attachments. 28 U.S.C. 1292(b).[11] In view of the controversial nature of some of the questions and the fact that immediate appeal of my decisions might have materially advanced the termination of the litigation, I certified certain questions to the Court of Appeals.[12] *New England Merchants National Bank v. Iran Power Generation and Transmission Company*, 508 F.Supp. 49 (S.D.N.Y.1980). On January 5, 1981, the Court of Appeals accepted the interlocutory review of the certified questions, scheduled argument, and stayed all proceedings in the district court pending its decision.[13]

Precisely two weeks later, on January 19, 1981, President Carter finalized an agreement with Iran to secure the release of the American hostages [the "Agreement"]. Under the Agreement, President Carter promised to "terminate all legal proceedings in the United States involving claims of United States persons and institutions against Iran" and to "nullify all attachments and judgments" obtained in such proceedings. To implement the Agreement, President Carter issued Executive Orders Nos. 12,276 through 12,285. 46 Fed.Reg. 7913–32 (1981). These orders, *inter alia*, revoked the license permitting attachment of the frozen assets, nullified the attachments acquired under the license, and required that the Iranian funds and securities be transferred out of the United States in accordance with the Agreement.

On February 24, 1981, President Reagan ratified the Agreement and issued Executive Order No. 12,294, 46 Fed.Reg. 14,111 (1981), "suspending" all claims which were eligible for resolution by the Iran-United States Claims Tribunal [the "Tribunal"]. The order also provided, however, that a decision on the merits by the Tribunal would be "final" and require termination of proceedings in the United States courts.

In light of these events, the Court of Appeals determined that the certified questions had been supplanted by a single, overriding question: "Were the actions of the President in suspending the law suits and nullifying the attachments consistent with constitutional power and any applicable statutory authority?" *New England Merchants National Bank v. Iran, supra*, 646 F.2d at 783. Since the issues had not been

**11.** On October 6, 1980, the United States asked to intervene in the 96 cases before this court to seek certification to the Court of Appeals of my denial of its request for an indefinite stay. Assuming that I would certify the question, the government also sought a stay pending the resolution of the issue by the Court of Appeals. Finding that certification of the indefinite stay question was inappropriate because it would not advance the termination of the litigation as required by the certification statute, 28 U.S.C. § 1292(b), I denied the government's requests on November 5, 1980. *New England Merchants National Bank v. Iran Power Generation and Transmission Company*, 508 F.Supp. 47 (S.D.N.Y.1980). The government then petitioned for a writ of mandamus to compel the district court to stay the proceedings. The Court of Appeals temporarily stayed proceedings in the district court pending its decision on the petition. On April 9, 1981, the court denied the mandamus petition.

**12.** On December 22, 1980, I certified the following questions to the Court of Appeals for the Second Circuit:

1. Did Executive Order No. 12,170 (November 14, 1979), 44 Fed.Reg. 67729, the Treasury Regulations promulgated thereunder and President Carter's subsequent reports to Congress suspend, dissolve or terminate the immunity from pre-judgment attachment that would otherwise be available to defendants under the Foreign Sovereign Immunities Act of 1976 and the Treaty of Amity?

2. If the answer to No. 1 above is yes, does the International Emergency Economic Powers Act (50 U.S.C. §§ 1701, *et seq.*) authorize the suspension, dissolution or termination of defendants' immunity from pre-judgment attachment in the manner that the Court found had occurred here?

3. If the answers to Nos. 1 and 2 above are yes, is the International Emergency Economic Powers Act constitutional as applied?

4. Whether sovereign immunity of the defendants under the Foreign Sovereign Immunities Act with respect to pre-judgment attachment has been waived, terminated or suspended by virtue of (a) the 1955 Treaty of Amity, Economic Relations and Consular Rights between the United States and Iran, or (b) the severance of diplomatic relations between the United States and Iran and actions taken by Iran in violation of international law.

**13.** The Court of Appeals also denied the government's mandamus petition.

presented or decided in the district court nor briefed on appeal, the Court of Appeals declined to rule on the validity of the Agreement or the orders. Accordingly, the Court of Appeals remanded the cases to me with instructions. *Id.* at 784.

Since the 96 cases were remanded to me, I have carefully analyzed each of them in an attempt to select the most appropriate case. After two hearings and many conferences, it became clear that the 96 cases before this court are a mixed bag. Since the Agreement was signed, some of the claimants have been paid the full amount claimed in their complaints; others have reached private settlement agreements with the Iranian defendants. Arbitration clauses or agreements to litigate in the Iranian courts render certain cases inappropriate for expeditious disposition of the issues raised by the Iranian Agreement or presidential orders. Still others do not believe their claims fall within the Agreement or cannot satisfy the jurisdictional requirements of the FSIA. Finally, a number of the claimants do not challenge the constitutionality of the Agreement or orders; instead, they assert merely a right to compensation in the event any judgment in their favor rendered by the Tribunal is not fully satisfied by the claims fund established by the Agreement. Some plaintiffs do not wish to press their claims in the apparent hope and expectation of renewing their commercial ventures with Iran. Thus, after reviewing all the cases on remand individually, I have been constrained to dismiss some actions, to vacate the attachments in others for lack of a showing of continuing need for the levy, and to place the great bulk of this litigation on the suspense docket of this Court.

The case that most clearly satisfies the criteria set forth by the Court of Appeals belongs to the Marschalk Company, Inc. Accordingly, the government's motion to intervene in the case is granted and I will analyze the validity of the Agreement and the executive orders within the context of the *Marschalk* case.

## The Parties

The Marschalk Company, Inc. ["Marschalk"] is an advertising company incorporated under the laws of New York to plan, create, write and place advertisements for its clients. Its principal place of business is at 1345 Avenue of the Americas, New York, New York.

Defendant Iran National Airlines Corp. ["Iran Air"] is a corporation organized under laws of the Government of Iran. Its principal place of business is Mehrabad Airport, Iran Air Head Office Building, Teheran, Iran. Iran Air is licensed to do business and is doing business in this jurisdiction. It has an office in New York City located at 345 Park Avenue. Iran Air's only point of arrival and departure in the United States is New York. Defendant Government of Iran ["Iran"] is a foreign sovereign state.

## Marschalk's Claim and Attachment

Iran, acting through Iran Air, entered into an advertising agreement with Marschalk effective August 15, 1978. Under the agreement, Marschalk was designated as Iran Air's advertising agent in the United States. In general, Marschalk promised to provide Iran Air with all the services usually rendered by advertising agencies for one year following the date of the contract and thereafter until termination by Iran Air or Marschalk on three months' notice.

As Marschalk created advertising and placed it in various print media, it invoiced the defendants for its costs and a commission based on the rates charged to Marschalk by the publishers with whom Iran Air advertisements were placed. The invoices were payable on or before the due date specified on the invoice.

Marschalk alleges that it performed its obligations under the contract and submitted a number of invoices to Iran Air seeking payment of Marschalk's costs and commissions for work already completed in connection with the contract. These invoices evidently were paid when due for several months. After the Government of Iran

changed hands in January, 1979, however, several payments were missed. By November 30, 1979, Marschalk had invoiced Iran Air for $46,528.02. According to Marschalk, no part of this sum has been paid by Iran Air or the Government of Iran. The defendants did not protest the invoices and, in fact, by their silence must be deemed to have acquiesced to the validity of the invoices and the amounts therein.

As further evidence of the claimed breach of contract, Marschalk points to certain events in Iran, which it claims constituted a repudiation of the Marschalk contract and other contracts with American companies. Marschalk notes first that the present government in Iran began to withdraw its assets from American banks. *N. Y. Times*, Nov. 16, 1979, at 16, col. 6 and 19, col. 1. Marschalk also cites the November 23, 1979 declaration by the then Iranian Foreign Minister Abolhassan Bani-Sadr that all foreign debts incurred by the Imperial Government were repudiated. Marschalk, therefore, filed suit on December 28, 1979, seeking a judgment against the defendants in the amount of $46,528.02 with interests and costs.

On December 31, 1979, this court granted Marschalk an *ex parte* order of attachment against Iran Air and Iran.[14] Plaintiff levied upon properties of defendants by serving the order of attachment on January 2, 1980 on several banks holding assets of the defendants. Marschalk moved to confirm its attachment in accordance with New York law on January 7, 1980. That motion is now ripe for decision.

The defendants and the United States oppose Marschalk's motion on the grounds that in accordance with the Iranian Agreement and Executive Orders (i) all legal proceedings regarding Marschalk's claim are suspended; (ii) the claim must be presented to the Tribunal for adjudication; and (iii) Marschalk's attachment is nullified. Marschalk argues that the actions taken by the President were not authorized by the Con-

stitution or the laws of the United States. Marschalk alternatively argues that if the President's actions were proper, they constitute a compensable taking under the fifth amendment to the Constitution.

All agree, however, that the President's power, if any, to enter an agreement with Iran and issue executive orders thereunder must stem either from an act of Congress or from the Constitution itself. *See Youngstown Sheet and Tube Co. v. Sawyer*, 343 U.S. 579, 585, 72 S.Ct. 863, 865, 96 L.Ed. 1153 (1952).

Perhaps the best framework for this Court's analysis of the President's actions is that provided in the celebrated concurrence of Justice Jackson in *Youngstown*. *Id.* at 634, 72 S.Ct. at 888. In considering President Truman's power to seize the nation's steel mills to prevent a threatened strike during the Korean War, Justice Jackson wrote:

> The actual art of governing under our Constitution does not and cannot conform to judicial definitions of the power of any of its branches based on isolated clauses or even single Articles torn from context. While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity. Presidential powers are not fixed but fluctuate, depending on their disjunction or conjunction with those of Congress. We may well begin by a somewhat oversimplified grouping of practical situations in which a President may doubt, or others may challenge, his powers, and by distinguishing roughly the legal consequences of this factor of relativity.
>
> 1. When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress

---

**14.** *Marschalk Company, Inc. v. Iran National Airlines Corp. and the Government of Iran*, 79   Civ. 7035 (CBM) (S.D.N.Y. Dec. 28, 1979).

can delegate. In these circumstances, and in these only, may he be said (for what it may be worth), to personify the federal sovereignty. If his act is held unconstitutional under these circumstances, it usually means that the Federal Government as an undivided whole lacks power. . . .

2. When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain. Therefore, congressional inertia, indifference or quiescence may sometimes, at least as a practical matter, enable, if not invite, measures on independent presidential responsibility. In this area, any actual test of power is likely to depend on the imperatives of events and contemporary imponderables rather than on abstract theories of law.

3. When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter. Courts can sustain exclusive Presidential control in such a case only by disabling the Congress from acting upon the subject. Presidential claim to power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system.

*Id.* at 635–38, 72 S.Ct. at 870–71 (footnotes omitted).

## I. Suspension of Legal Proceedings in United States Courts

### A. Presidential Authority Under IEEPA

#### 1. Express Authority Under IEEPA

■ The defendants and the government argue first that Congress, under IEEPA, authorizes the President to terminate the legal proceedings involving Marschalk's claim against Iran Air. Thus, they contend, the actions of the President in the case at bar fit into the first category set forth in Justice Jackson's opinion. Particular reliance is placed on the President's power under IEEPA when faced with a national emergency to regulate, nullify, prevent or prohibit the acquisition or exercise of any rights by any person within the jurisdiction of the United States with respect to property located within the United States in which a foreign country or national has an interest. 50 U.S.C. § 1702(a)(1)(B) (Supp. III 1979).[15]

The government and the defendants argue that Marschalk's claim against Iran in American courts represents an attempt to acquire or to exercise a right with respect to Iranian property situated in the United States, and thus, under IEEPA, such claims may be extinguished.[16] No precedent for such a construction is offered.

---

15. 50 U.S.C. § 1702(a)(1) provides:

Sec. 203. (a)(1) At the times and to the extent specified in section 202, the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise—

(A) investigate, regulate, or prohibit—

(i) any transactions in foreign exchange.

(ii) transfers of credit or payments between, by, through, or to any banking institution to the extent that such transfers or payments involve any interest of any foreign country or a national thereof.

(iii) the importing or exporting of currency or securities; and

(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest:

by any person, or with respect to any property, subject to the jurisdiction of the United States.

16. I use the word "extinguished" since there is an apparent conflict between the Agreement which uses the word "terminate" and Executive Order No. 12,294 wherein the word "suspended" is used. As discussed later, there is no practical difference. See discussion at p. 83 *infra*.

The characterization of Marschalk's claim as an acquisition or exercise of a right related to Iranian property in the United States is a vain endeavor by the government and the defendants to fit Marschalk's claim into one of IEEPA's pigeonholes which would render it amenable to regulation by the President. *Accord, American International Group, Inc., supra,* 657 F.2d 430 at 443 n.15; *Chas. T. Main International, Inc., supra,* 651 F.2d 800 at 809 n.13. Putting aside the question of attachment, see discussion at p. 94, *infra,* and considering merely the suspension of the claim, Marschalk, in fact, is not seeking by its claim to acquire or exercise a right with respect to any particular Iranian property located within the United States. Instead, Marschalk seeks only to establish in the appropriate court of law its rights to payment for services rendered to the defendants under an advertising contract and to obtain a judgment, irrespective of what Iranian property located here or anywhere else in the world is used to satisfy the judgment.

■ Marschalk's claim also is not subject to regulation because it is not the type of "property" that Congress intended the President to regulate under IEEPA. Although Marschalk's claim and its contract rights are property interests protected by the fifth amendment of the United States Constitution ["Fifth Amendment"],[17] it is clear from the legislative history that the types of property over which the President has power under IEEPA include only securities, currencies and other tangible properties situated in the United States. H.R. Rep.No.95–459, 95th Cong. 1st Sess. 15 (1977) ["IEEPA H.Rep."].

Furthermore, the President is precluded from regulating Marschalk's claim under IEEPA because the Iranians do not have a property interest in Marschalk's claim. The government admits that the only party which has a property interest in Marschalk's claim or in Marschalk's contract rights is Marschalk. See Transcript at 57–59, *The Marschalk Company, Inc. v. Iran*

*Airlines Corp., et al.,* (S.D.N.Y. June 5, 1981). The Iranians do not have any cognizable property interests in Marschalk's claim or contract rights. They have only an interest in defending against Marschalk's claim, but that interest is not property. The defendants' rights under the contract are separate from Marschalk's and allegedly have been satisfied by Marschalk's complete performance under the contract. Thus, even if claims and contract rights in which a foreign party has an interest do constitute property under IEEPA, Iran has no property interest in Marschalk's claims and contract rights and, therefore, the President cannot exercise his IEEPA powers over them.

It may be argued that execution in this country on a judgment obtained in this case could be a "transfer" within IEEPA but that cannot be the basis for terminating the litigation. To do so is to ignore the fact that most judgments are not executed upon; the impact of the judgment—psychological, moral and political—often renders such execution unnecessary. It follows, therefore, that the Agreement terminating the litigation of this claim and transferring it to the Tribunal exceeds the President's power under the express language of IEEPA.

### 2. Implied Authority Under IEEPA—The Legislative History

Moreover, the sweeping powers which the executive department would read into the IEEPA find no support in the legislative history of that Act. Congress intended to define and reduce the power of the President by the passage of the Act, not to expand it.

A review of the legislative history also makes clear that Congress did not merely fail to authorize the President under IEEPA to take United States' citizens claims and transfer them to another tribunal; it acted affirmatively to prevent such action by the President.

---

**17.** See discussion on p. 92, *infra.*

IEEPA was enacted in 1977 as part of "Trading With the Enemy Act Reform Legislation." The Trading With the Enemy Act of 1917, 50 U.S.C.App. §§ 1 et seq. (1976) ["TWEA"]. TWEA had authorized the President to take certain extraordinary measures, such as seizing and vesting foreign property, in times of war and peace. Deeply concerned that TWEA had "become essentially an unlimited grant of authority for the President to exercise at his discretion, broad powers in both the domestic and international economic arena." Congress limited TWEA's broad grant of authority to times of declared war. IEEPA H.Rep. at 2, 7, 10. Congress agreed with the constitutional scholars that the "TWEA is a prime example of the unchecked proliferation of Presidential power for purposes totally unforeseen by the creators of that power." Id. at 9.

IEEPA limited the President's peace-time emergency powers to the "the regulation of international economic transactions." Id. at 10–11. The President does not have the power under IEEPA, as he did under TWEA, to seize foreign property or records or to take title to any property of any foreign country or national thereof for the benefit of the United States. Id. at 2; House Markup Before The Committee on International Relations, 95th Cong., 1st Sess. 3–4 (1977). Nor does the President have the power to regulate purely domestic transactions or authority to control non-economic aspects of international intercourse. IEEPA H.Rep. at 11.

In the case of Marschalk, the President contravened the prohibitions on his power under IEEPA in at least three ways. First, the Agreement and the Executive Orders attempt to interfere with a purely domestic economic transaction between Marschalk and Iran Air. Marschalk, a United States company, agreed to and did render advertising services solely within the United States to an airline which is doing business in the United States. The purpose of the advertising was to convince United States' residents to patronize the airline. Bills were sent to Iran Air's office in New York City and payments made from Iran Air's account with a New York bank. The fact that a foreign corporation paid for and benefited from the services does not transform the nature of the transaction and the services performed thereunder from domestic to international.

A similar conclusion was drawn by the Supreme Court in the Youngstown case. There, domestically produced steel was needed for United States military efforts in the Korean War. Despite the relationship between the steel production and our foreign affairs, the Supreme Court held that the President could not interfere with the domestic operation of the steel mills to ensure sufficient steel was produced for the Korean effort. Youngstown, 343 U.S. at 589, 72 S.Ct. at 867.

Second, the President, by the Agreement and the Executive Orders, is endeavoring to control non-economic aspects of international intercourse. In the instant case, the plaintiff and the defendants were no longer transacting business with one another; the negotiation stage was long past, the plaintiff's obligations under the contract allegedly satisfied. Instead, the parties were adjudicating the rights of Marschalk arising out of an economic transaction which transpired long before the President entered into the Agreement and issued the Orders.

Finally, the termination of Marschalk's claim and transferral of the claim to the Tribunal constitute a seizure of property belonging to a United States citizen. Although the President did not have the authority to seize or vest property of United States citizens even under TWEA, the government would have this court infer from the language of IEEPA that the President now has such authority. As I have already discussed, such a construction is impossible because Marschalk's claim is not an attempt to acquire or exercise a right in Iranian property, is not property within the meaning of IEEPA, and is not property in which Iran has an interest. The mandate against vesting or seizure of the property of foreign governments and nationals thereof only further supports the conclusion that

the President could not under IEEPA take Marschalk's claim. Surely, if the President is prohibited from seizing property of the country whose actions instigated the crisis, Congress did not intend that the property of United States' claimants could be seized and used at the President's sole discretion as ransom.

The legislative history of IEEPA also indicates that Congress intended that the President, in responding to emergencies would protect, not prejudice, the ability of United States citizens to recover claims against foreign countries. IEEPA H.Rep. at 17. Private claimants are not barred by the language or history of IEEPA from bringing suit against a foreign defendant during a state of emergency declared by the President, nor were they barred from doing so under TWEA, IEEPA's predecessor. *Zittman v. McGrath*, 341 U.S. 446, 71 S.Ct. 832, 95 L.Ed. 1096 (1951); *Vishipco Line v. Chase Manhattan Bank, N. A.*, 77 Civ. 1251 (S.D.N.Y. Nov. 3, 1978). In addition, the legislative history of the portion of TWEA which is now § 1702(a)(1)(B) of IEEPA reveals that two of the "chief objectives" of TWEA were (i) prevent hostile nations from benefiting from trade with American citizens; and (ii) utilization of enemy property within the United States, *inter alia,* to satisfy the claims of United States citizens. H.R.Rep.No.85, 65th Cong., 1st Sess. 1 and 4 (1917) ["TWEA" H.Rep.]. Extinguishing Marschalk's claim is inconsistent with both purposes.

3. Conflict Between President's Actions and an Act of Congress

a. Limits on President's Power under FSIA

■ The suspension by the President of litigation of Marschalk's claim in the United States courts is not only unauthorized by IEEPA, it is prohibited by the FSIA. Thus, it cannot be argued that the President's actions fall within the "twilight zone" described in Justice Jackson's second category. Rather than acquiescing to Presidential interference in the litigation of commercial claims against foreign defendants, Con-

gress, in enacting FSIA in 1976, eliminated such Executive interference. Congress also specifically refused to give the President the power to enter into agreements with other nations which would circumscribe the jurisdiction of the United States courts over international commercial claims under the FSIA.

The government argues that "certainly the Executive Branch when it proposed and supported the FSIA, did not believe it was giving up the President's traditional claims settlement authority." Brief for Government at 23 n.****. This argument is included in a footnote perhaps because the government cannot suggest any other reason for the statute than the obvious, i. e., that the settlement of commercial claims (such as involved here) was to be relegated to the courts without interference from the executive. The sorry history of giving untrammeled power to the executive in such situations certainly gave great impetus to the passage of the FSIA. This is well supported by the legislative history of the FSIA.

Prior to the FSIA, jurisdiction of actions brought by United States citizens against foreign states was provided solely in 28 U.S.C. § 1332(a) (1976). Such actions, however, could be terminated by the State Department by filing a "suggestion of immunity" to which courts would normally "defer." *See, e. g., Rich v. Naviera Vacuba, S. A.,* 197 F.Supp. 710 (E.D.Va.), *aff'd,* 295 F.2d 24 (4th Cir. 1961). Thus, a foreign state that did not wish to be sued in the United States courts would typically request that the State Department file a suggestion of immunity. S.Rep.No.94–1310, 94th Cong., 2d Sess. 9 (1976) ["FSIA S.Rep."]. A principal purpose behind the FSIA was to transfer the determination of sovereign immunity from the executive branch to the judicial in order to assure litigants that immunity decisions are made on purely legal grounds, under procedures that insure due process, rather than on foreign policy grounds. *Id.*

■ Under the FSIA, a federal or state court has jurisdiction of a commercial claim against a foreign state so long as the claim has specified "minimum jurisdictional contacts" with the United States. 28 U.S.C. § 1330, 1605(a)(2) (1976). Judge Werker of this court, in granting Marschalk an attachment, implicitly found that FSIA jurisdiction exists in this case. Indeed, as earlier stated, the great weight of "contacts" in this case is wholly within the United States.

The legislative history of the FSIA provides a clear record of Congress' decision to eliminate all executive branch interference with the jurisdiction of United States courts of commercial claims of United States citizens against foreign defendants. The history states that FSIA was intended to "set forth the sole and exclusive standards to be used in resolving questions of sovereign immunity," to "preempt" all inconsistent federal law and to commit sovereign immunity decisions exclusively to the courts. H.R.Rep.No.94–1487, 94th Cong., 2d Sess. 12 (1976), U.S.Code Cong. & Admin.News 1976, pp. 6604, 6610 ["FSIA H.Rep."].

Furthermore, Congress refused to adopt provisions allowing the President to determine the jurisdiction of the courts in times of emergency. At the hearings in the House of Representatives, Congress was asked to weigh the advantages and disadvantages of allowing the President to interfere with court proceedings as the need arose during international emergencies. Hearings on H.R. 11,315 before the Subcomm. on Administrative Law and Government Relations of the House Comm. on the Judiciary, 94th Cong., 2d Sess. 34 (1976) ["FSIA H.Hearings"]. A proponent of executive interference power argued that such power was necessary to give the President "flexibility" in international affairs particularly in times of emergency. He cited the deal struck with Cuba by the State Department whereby a suggestion of immunity was traded for a hijacked United States airliner. Id. at 61–65. Congress, however, rejected this proposal and instead, determined that sovereign immunity decisions are to be made "exclusively by the courts and not by a foreign affairs agency." FSIA H.Rep. at 7, p. 6606.

The original version of the FSIA proposed by the State and Justice Departments sought to allow executive interference with court jurisdiction through executive agreements. The proposed bill provided that the FSIA would be "subject to existing and *future international agreements.*" H.R. 11315, 94th Cong., 2d Sess. § 1604 (1976) ["FSIA H.Bill"] (emphasis added). The reference to "*future international agreements*" was deleted in committee, "to eliminate any possible question that this language might be construed to authorize a future international agreement" that might interfere with court jurisdiction. FSIA H.Rep. at 10, 6608. The committee wished to eliminate any possible "discretion to the State Department ... to change the basic substance of the law." FSIA H.Hearings at 52.

I recognize that others have analyzed this question by positing as an axiom the President's "broad powers" to conduct foreign affairs which were not mentioned in the FSIA and concluded that the settlement of private commercial claims of United States citizens against foreign governments and their instrumentalities by international executive agreement is still within the foreign affairs power of the President. *See, e. g., Security Pacific National Bank v. The Government and State of Iran*, 513 F.Supp. 864 (C.D.Cal.1981). This ignores the stated intent of the Congress in passing the FSIA *to curtail* the "broad powers" of the executive in dealing with foreign governments. It would be totally incongruous if Congress took away from the executive the power to dispose of certain lawsuits against foreign governments by "suggestions of immunity" and yet intended to permit the same result by international executive agreements.

Finally, nothing in the language or in the legislative history of IEEPA indicates that Congress intended to grant an "emergency" exception to the clear rule under the FSIA that the executive branch may not interfere with the jurisdiction of the United States courts over commercial claims against for-

eign defendants. Lacking an express authorization by Congress, the President may not interfere with domestic litigation in the courts of this country. *White v. Mechanics Securities Corp.*, 269 U.S. 283, 301, 46 S.Ct. 116, 118, 70 L.Ed. 275 (1925).

### b. Suspension v. Termination

The government also argues that the President has not interfered with the jurisdiction of the courts under the FSIA because the President has only "suspended" the claims until final disposition by the Tribunal, not terminated them. Lawsuits against Iran may continue to be initiated in any appropriate district court and the Executive Order does not affect claims of litigants whose claims do not fall within the jurisdiction of the Tribunal.

Whether the executive department is attempting to "terminate" lawsuits such as this or merely "suspend" them is unclear. *Compare* Agreement *with* Executive Order No. 12,294, 46 Fed.Reg. 14,111 (1981). To my mind, there is no practical difference.

The Agreement provided that the United States was "to *terminate* all legal proceedings in United States courts involving claims of United States persons and institutions against Iran and state enterprises, to *nullify* all attachments and judgments obtained therein, to prohibit all further litigation based on such claims, and to bring about the termination of such claims through binding arbitration." Declaration of the Government of the Democratic and Popular Republic of Algeria at 1, ¶ B (1981) (emphasis added).

By Executive Order No. 12,294, *supra,* the President *"suspended"* "[a]ll claims which may be presented to the Iran-United States Claims Tribunal under the terms of Article II of the Declaration of the Government of the Democratic and Popular Republic of Algeria Concerning the Settlement of Claims .... During the period of this *suspension,* all such claims shall have no legal effect in any action now pending in any court of the United States ...." 46 Fed.Reg. No. 14,111 (1981) (emphasis added).

Whether the executive is attempting to foreclose United States citizens from access to United States courts to vindicate rights obtained by contract wholly performed within the United States, such as in the case at bar, by "termination" or "suspension," the intent is the same. While it may be that "suspending" the claims without limit is more acceptable in a public relations sense than "terminating" or "nullifying" the claims, the result in either case is to prevent claimants from asserting their rights in federal court. I must deal with this reality rather than niceties of language. "A rose by any other name ...." Shakespeare, *Romeo and Juliet,* Act II, Scene 2, Lines 41–42.

In view of the fact that Marschalk's claim fits within the jurisdiction of the Tribunal and that a determination by the Tribunal will be final for all purposes, I must conclude that the jurisdiction of the United States courts over the claim has been withdrawn by the President.

The Court of Appeals for the District of Columbia distinguishes between the suspension of a claim and the suspension of the litigation of a claim before a United States court. *American International Group, Inc. v. Islamic Republic of Iran, supra,* 657 F.2d at 442–43. The court finds in the Iranian cases that the President suspended the claims and did not order the litigation or the power of the court to consider the claims suspended. The court apparently concedes that the suspension of litigation would be a transgression of the jurisdiction of the courts but believes that a suspension of a claim is not. The court views the suspension of a claim "as an effort to modify not the jurisdiction of the courts, but the substantive rule of law they are to apply." The court concludes by saying that if the suspension was constitutional, then the executive order must be applied on appeal under the rule of *United States v. The Schooner Peggy,* 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801) (new law must be applied on appeal even if it is contrary to old law).

I am somewhat at a loss to understand much of the reasoning of the Court of Appeals for the District of Columbia Circuit. For instance, the court suggests that "[a]fter the arbitration has run its course, and if the judicial process resumes, appellants [i. e. Iran] will be able to contest the summary judgment award." *American International Group, Inc., supra,* 657 F.2d at 448. If, as the court suggests, after the arbitration by the Tribunal, the United States court is to restart the proceeding before it, what is that district court supposed to do? The decision of the Tribunal is supposedly "final." Is the district court to act as an appellate court reviewing what the Tribunal would have done? Is the Tribunal empowered to ignore the judgment of the district court? I would suggest that the approach taken by the District of Columbia Circuit Court in their decision raises far more problems than it resolves.

Furthermore, the claims themselves have not been suspended entirely; they still exist for purposes of the Tribunal. The legal proceedings properly before the United States courts, however, have been suspended in effect permanently.

In brief, I cannot agree with the Court of Appeals for the District of Columbia that the suspension of the legal proceedings before United States' courts does not circumvent the exclusive jurisdiction of the United States courts over commercial claims against foreign defendants. The President has said, in effect, that the Tribunal, not the courts of the United States, shall have jurisdiction over certain plaintiffs' claims against Iranian defendants. I find that by taking such an action, the President has acted contrary to the will of Congress expressed so clearly in the FSIA.[18]

In the absence of a congressional grant of authority to suspend the litigation of the claims and in view of the incompatibility of the measures taken by the President with the expressed will of Congress that the President not limit the court's jurisdiction over international commercial claims via international agreement, the President can only rely upon his own constitutional powers minus any constitutional powers of Congress over the matter. *See Youngstown,* 343 U.S. at 637, 72 S.Ct. at 871 (Jackson, J., concurring). In this situation, the President's power is "at its lowest ebb" and the assertion of such power "must be scrutinized with caution . . . ." *Id.*

**18.** The effect of the so called Hostage Act, 22 U.S.C. § 1732 (1976), [a term first used by the Justice Department in this crisis] was not argued before me. It appears *deus ex machina* in a "separate statement" in the decision of the District of Columbia Circuit in the *American International Group* case. *American International Group, Inc. v. Islamic Republic of Iran,* 657 F.2d 448 (D.C.Cir.1981) (separate statement by McGowan, J.). Judge Mikva dissented from this separate statement. *Id.* (separate statement by Mikva, J.). That statute provides:

Whenever it is made known to the President that any citizen of the United States has been unjustly deprived of his liberty by or under the authority of any foreign government, it shall be the duty of the President forthwith to demand of that government the reasons of such imprisonment; and if it appears to be wrongful and in violation of the rights of American citizenship, the President shall forthwith demand the release of such citizen, and if the release so demanded is unreasonably delayed or refused, the President shall use such means, not amounting to

acts of war, as he may think necessary and proper to obtain or effectuate the release; and all the facts and proceedings relative thereto shall as soon as practicable be communicated by the President to Congress.

Any argument based on this section suffers from the same infirmities of those advanced by the government here.

The District of Columbia Circuit Court also quotes with apparently some approval an argument finding its roots in Professor Lillich's article. Lillich, The Gravel Amendment to the Trade Reform Act of 1974: Congress Checkmates a Presidential Lump Sum Agreement, 59 Am.J.Int'l.L. 837 (1975). The court suggests that if the President takes some action of which the Congress does not approve then Congress can pass a law or resolution specifically disapproving the action taken. *American International Group, supra,* 657 F.2d at 446. This is an interesting argument but it would revamp our entire system of government with the President having unlimited powers and the Congress having a final veto, thus rendering constitutional review by the Judiciary unnecessary.

## B. *The President's Article II Authority to Conduct Foreign Affairs*

The fact that steps had to be taken to secure the release of the hostages does not mean that the President suddenly has the constitutional authority to divest the courts of jurisdiction and deny United States citizens access to United States courts. As Justice Douglas stated in his concurring opinion in *Youngstown*, "the emergency did not create power, it merely marked an occasion when power should be exercised." 343 U.S. at 629, 72 S.Ct. at 886. It is true that the President as an individual can act more quickly than the Congress. Legislative action, by contrast, can be time-consuming and inefficient. But as Mr. Justice Brandeis stated in his dissent in *Myers v. United States*, 272 U.S. 52, 293, 47 S.Ct. 21, 84, 71 L.Ed. 160 (1926):

> The doctrine of the separation of powers was adopted by the Convention of 1787, not to promote efficiency but to preclude the exercise of arbitrary power. The purpose was, not to avoid friction, but, by means of the inevitable distribution of the governmental powers among three departments, to save the people from autocracy.

As in *Youngstown*, the issue of whether the President has the constitutional power to take certain actions cannot be decided by determining which branch of the government can resolve a crisis most expeditiously; the answer depends on the allocation of powers under the Constitution.

Article II confers certain powers on the President to deal with our relations with other nations. These powers expressly provided in Article II are the ability to conclude treaties and appoint ambassadors, with Senate consent, and to receive ambassadors and other foreign officials. These enumerated powers do not provide authority for the actions taken by the President in this case. If the President had the constitutional authority to enter the Agreement and issue executive orders thereunder, it must be implied from the aggregate of his powers under the Constitution.

There is complete agreement that the President has the power to enter executive agreements with other nations but a vast area of disagreement among the parties as to what actions the President may take under such agreements.

The government would have this court ascribe to the President almost boundless discretion in the field of foreign affairs. The government finds authority for this proposition in *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936). In that case, the Supreme Court recognized that the President's foreign affairs powers extend beyond those specifically enumerated in the Constitution. The Court found that the President has "the very delicate, plenary and exclusive power as the sole organ of the federal government" in the field of foreign affairs. *Id.* at 320, 57 S.Ct. at 221. The government's suggestion, however, that by this statement the President's power is without limits when he steps into the foreign affairs arena reads far too much into the *Curtiss-Wright* opinion and ignores later Supreme Court rulings regarding limits on the exercise of presidential power.

*Curtiss-Wright* involved an executive order issued by the President pursuant to a Joint Resolution of Congress. The Resolution provided that if the President found that prohibiting the sale of arms and munitions to countries engaged in armed conflict in the Chaco would help restore peace between those nations and issued a proclamation to that effect, then it would be unlawful to sell arms and munitions to such countries. *Id.* at 312, 57 S.Ct. at 217. After President Roosevelt issued the necessary proclamation, the Resolution was challenged by the plaintiff as an excessive delegation of legislative power to the President. The Resolution, and consequently the President's order, were upheld on the grounds that the President had sufficient constitutional authority to prohibit the sale of arms to foreign countries.

Although the portions of the opinion regarding the President's "plenary and exclusive" foreign affairs power have been

sharply criticized by constitutional scholars,[19] I need not pause here to address those legitimate concerns. Assuming Justice Sutherland was correct in stating that the President constitutionally had the "plenary and exclusive" authority to order the cessation of arms sales to foreign countries, his opinion does not support the government's contention here that the President's foreign affairs powers gives him the authority to issue orders which circumvent an act of Congress and impair constitutional rights of citizens.

In *Curtiss-Wright*, the President was acting pursuant to an express authorization of Congress. His actions, thus, fell within the first of the three categories cited by Justice Jackson in *Youngstown* where the President's authority is at its maximum "for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown*, 343 U.S. at 635, 72 S.Ct. at 870. The situation in *Curtiss-Wright* is in sharp contrast to that presented in the case at bar. Here, the President's orders terminating the litigation of Marschalk's claim against the defendants are totally incompatible with the will of Congress. In effect, he has attempted to circumvent a statute enacted by Congress, the FSIA. His actions, therefore, fall within Justice Jackson's third category where the President's "power is at its lowest ebb, for he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Id.* at 637, 72 S.Ct. at 871. As Justice Jackson cautions, a Presidential claim to an exclusive power must be closely scrutinized, "for what is at stake is the equilibrium established by our constitutional system." *Id.* at 638, 72 S.Ct. at 871.

I must, therefore, analyze whether the Executive Agreement and Presidential Orders terminating this litigation do in fact upset "the equilibrium established by our constitutional system" by infringing upon the powers of Congress and the Judiciary.

### 1. Jurisdiction of This Proceeding is Vested in United States Courts

There can be very little doubt that this court has jurisdiction over this case, but rather than leave the matter to any possible conjecture, I will set out the basis for this jurisdiction.

The extent of possible jurisdiction which may be vested in federal courts in the United States is found generally in Article III of the Constitution. That Article provides in pertinent part:

Section 1. The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

Section 2. The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies between two or more States;—between a State and Citizens of another State;—between Citizens of different States,—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

While Article III sets out the possible extent of the jurisdiction of our federal

---

19. *See, e. g.*, Levitan, The Foreign Relations Power: An Analysis of Mr. Justice Sutherland's Theory, 55 Yale L.J. 467 (1946); Lofgren, United States v. Curtiss-Wright Export Corporation: An Historical Assessment, 83 Yale L.J. 1 (1973); Berger, The Presidential Monopoly of Foreign Relations, 71 Mich.L.Rev. 1, 26–33 (1972); and Henkin, Foreign Affairs and the Constitution 19–26 (1972). *Cf. American International Group, Inc., et al. v. Islamic Republic of Iran*, 657 F.2d at 433–34 (D.C.Cir.1981).

courts, our Founding Fathers recognized that the exigencies of growth and other imponderables made it necessary for that jurisdiction to expand and contract as the need arises. Thus, the power to define the actual jurisdiction of the federal courts is expressly committed to Congress. U.S. Const. Art. I § 8, cl. 2; Art. III § 1, 2, Cl. 2.

█ It has recently been reiterated that federal court jurisdiction in "every case must be supported by both a Congressional grant of jurisdiction and a constitutional base on which the statute rests." *Verlinden B. V. v. Central Bank of Nigeria*, 647 F.2d 320, 324 (2d Cir. 1981). *See also* the cases cited therein.

Such a congressional grant is generally found in the statutes of the United States. *See, e. g.*, 28 U.S.C. § 1332 (1976). It may also be occasionally found in treaties which have been signed on behalf of the United States and which have been ratified by the Senate as required by the Constitution. *See, e. g.*, Treaty of Amity, Economic Relations and Consular Rights, August 15, 1955, United States-Iran, 8 U.S.T. 901 *et seq.* ["Treaty of Amity"].

█ In the cases presently before me, the jurisdiction of this court is found in Article III § 2: "The judicial Power shall extend to all Cases, in Law and Equity arising under this Constitution, the Laws of the United States, and Treaties . . .; to controversies . . . between a State, or the Citizens thereof, and foreign States, Citizens or Subjects." The congressional grant of jurisdiction over the present controversies may be found in sections 1330 & 1332 of Title 28 U.S.C. (which is part of the Foreign Sovereign Immunities Act of 1976) and in the Treaty of Amity. Section 1330 of Title 28 U.S.C. provides in pertinent part:

> The district courts shall have original jurisdiction . . . of any nonjury civil action against a foreign state as defined in section 1603(a) of this title [which would include Iran National Airlines Corp. and the Government of Iran] as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity . . . .

The case at bar falls within one of the general exceptions to jurisdictional immunity of a foreign state provided in FSIA. This case is "based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere . . . ." 28 U.S.C. § 1605(2). Thus, the defendants are not entitled to immunity from this law suit.

Any fair reading of just the above sections of the FSIA would give this court jurisdiction over the instant law suit. The same result flows from the Treaty of Amity.

Article III, section 2 of the Treaty of Amity provides:

> Nationals and companies of either High Contracting Party shall have freedom of access to courts of justice and administrative agencies within the territories of the other High Contracting Party, in all degrees of jurisdiction, both in defense and pursuit of their rights, to the end that prompt and impartial justice be done. Such access shall be allowed, in any event, upon terms no less favorable than those applicable to nationals and companies of such other High Contracting Party or any third country. It is understood that companies not engaged in activities within the country shall enjoy the right of such access without any requirement of registration or domestication.

8 U.S.T. at p. 902.

Article XI, section 4 of the same Treaty provides:

> No enterprise of either High Contracting Party, including corporations, associations, and government agencies and instrumentalities, which is publicly owned or controlled shall, if it engages in commercial, industrial, shipping or other business activities within the territories of the other High Contracting Party, claim or enjoy, either for itself or for its property, immunity therein from taxation, suit, execution of judgment or other liability to which privately owned and controlled enterprises are subject therein.

There can be no doubt that the defendant Iran Air was and is owned and controlled by the defendant the Government of Iran; that this law suit arises from commercial and business activities of Iran Air with the plaintiff Marschalk within the territory of the United States; and that by reason of the sections of the FSIA and the Treaty of Amity quoted above, both defendants are amenable to suit in this court. Even the Government of the United States as Intervenor here admits as much. *See* Brief for Government at 46 n.*.

In the face of this plethora of provisions authorizing jurisdiction in this court over this litigation, the defendants argue that the President can, by invoking his foreign affairs powers, supercede this court in the resolution of this controversy.

### 2. President's Power to Suspend Litigation of Claims

█ The government and the defendants contend that the President has the authority to suspend litigation in United States courts and transfer claims to a tribunal under his "broad and plenary authority to conduct foreign affairs." They argue that the President's actions regarding Marschalk's claim constitute a settlement of the claim and the President's control of foreign affairs includes the power to settle claims of United States citizens against other nations and their instrumentalities.

Even assuming for the moment that the President has the constitutional authority to settle claims, I seriously question that the President actually "settled" the claims of Marschalk and the other plaintiffs under the Agreement with Iran. The term "settlement" implies that the plaintiffs receive something of value in exchange for the termination of adjudicative proceedings in United States courts of their claims. In the instant cases, nothing has been received in exchange for the suspension of litigation in the United States. Instead, Marschalk and the other plaintiffs must still seek satisfaction of their claims. They, however, have lost their rights to litigate in the United States courts and are forced to pursue their claims before an arbitral tribunal located in a foreign country. They also lose the guarantees of due process afforded by the United States courts as well as the right of appeal. Furthermore, if successful on the merits of the Tribunal, the plaintiffs may only receive as little as 20 cents on a dollar since the identified claims of United States citizens against Iran and its instrumentalities exceed by over five times the amount Iran has put in the settlement fund.

It has also been suggested that Iran has given up some consideration other than the release of the hostages for the resolution of its various disputes with United States citizens. I fail to see any such consideration. It is urged that Iran has given up the defense of sovereign immunity before the Tribunal. But that is neither a concession nor consideration, because in the case at bar the defense of sovereign immunity is unavailable to Iran under either the FSIA or the Treaty of Amity. Nor can the establishment of a fund by Iran be considered as any consideration. The Agreement would have this country and its citizen-claimants give up the assets subjected to the attachments in return for a minor portion of those very same assets and a mere promise to pay on the part of Iran.

In short, it was the hostage crisis that was settled by the Agreement, not Marschalk's and the other plaintiffs' claims. There is no settlement of a case where the adjudication of the rights of the parties is merely transferred to another forum. To suggest otherwise, as the First Circuit does in the *Chas. T. Main* case, *supra*, at 812, puts the cart before the horse. The claims were but the means used by the United States to purchase the precious freedom of the hostages. I know of no case, other than those arising from the present situation, that holds that the President has the constitutional power to take possession of private property and bargain with it to secure the release of American hostages or for any other foreign policy purpose.

It is, however, the government and defendants' contention that the termination of litigation of Marschalk's claim and its

future transfer to the Tribunal is a "settlement" of the claims under the Agreement. Assuming that the President did effect a settlement of Marschalk's claim, I turn now to the question of whether he had the constitutional authority to effect such a settlement in order to obtain the release of the hostages.

The government and defendants attempt to establish that the President has the constitutional authority to settle claims by citing two cases upholding an executive agreement with Russia. *United States v. Pink*, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942); *United States v. Belmont*, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937). Neither of these cases, however, holds that the President has the power to settle, by executive agreement, claims of United States citizens against foreign governments by executive agreement.[20]

The *Belmont* case involved an agreement between the President of the United States and the Soviet Government called the Litvinov Agreement. Under the Agreement, the Soviet Union assigned all *its* claims *against* American nationals with the understanding that the United States would notify the Soviet Government of all the amounts realized by the United States from such release and assignment. *Id.* at 326, 57 S.Ct. at 758. The Litvinov Agreement was one part of the larger plan to bring about a settlement of the rival claims of the competing interests in order to establish diplomatic relations between the countries.

At issue in *Belmont* was the right of the United States under the Agreement to recover funds deposited with a New York private banker, Belmont, by a Russian corporation which was nationalized by Russian decree in 1918. The Court upheld the power of the President to enter the Litvinov Agreement with the Soviet Government; it rejected the argument that the action by the United States under the Agreement was barred because the Russian corporation and its United States deposit had been taken by the Soviet Government without compensation. *Id.* at 332, 57 S.Ct. at 761. The

Court properly noted that it could not apply the United States Constitution and laws to the acts of other governments. *Id.* The Court, however, explicitly reserved the question as to whether the executive agreement could have been enforced if it had impaired the constitutional rights of United States citizens. *Id.*

The *Pink* case also involved the Litvinov Agreement. 315 U.S. at 203, 62 S.Ct. at 552. There the issue concerned the United States claim under the Agreement to assets of a New York branch of a Russian insurance company which had been nationalized by the Russian Government. The branch discontinued operations in 1925 and Pink, the Superintendent of Insurance of New York State, took possession of its assets pursuant to state court orders. After settling the claims of the branch's domestic creditors, Pink retained the balance of the assets for distribution, pursuant to state law, to foreign creditors and thereafter to the directors of the Russian company. The United States then brought suit under the Litvinov Agreement to recover those remaining assets. Citing *Belmont*, the Court again upheld the Litvinov Assignment as a valid exercise of Presidential authority and found, therefore, that the United States was entitled to the assets against foreign creditors. *Pink*, supra, 315 U.S. at 234, 62 S.Ct. at 567. The Court stressed the fact that all of the claims of United States citizens had been paid. *Id.* at 211, 226, 62 S.Ct. at 556, 563. Thus, the enforceability of an executive agreement that transgresses the constitutional rights of United States citizens was again left for another day.

The government places much reliance on Justice Frankfurter's concurring opinion in *United States v. Pink*, 315 U.S. at 234, 62 S.Ct. at 567, which supports such presidential power. That opinion, not concurred in by any other Justice, represents but one man's opinion and clearly the broad brush dicta contained therein is not binding on this court. Indeed, I have no doubt that the proposition for which the government

**20.** *See also American International Group, Inc., supra*, 657 F.2d at 437–439.

wishes me to rely on it was far from the mind of Justice Frankfurter.

Therefore, while the *Belmont* and *Pink* cases support the President's power to enter into executive agreements with other governments, at least when it is incident to the recognition of a foreign government, they do not stand for the proposition that the President may take claims of United States citizens and use them as bargaining chips when negotiating an international agreement.

Other authorities which the government and the defendants refer to involve treaties ratified by the Senate as required by the Constitution. *See, e. g., United States v. Schooner Peggy,* 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801). While the government maintains that executive agreements are "the law of the land," even it does not attempt to equate an executive agreement with a treaty. For example, a treaty binds each nation which is a signatory to the covenants contained therein. On the other hand, an executive agreement purports to bind only the administration which executed it. Its terms may be modified unilaterally by a succeeding administration.[21] That is exactly what happened in this case. President Carter purported to terminate the instant litigation, but Executive Order No. 12,294, 46 Fed.Reg. No. 14,111 (1981) issued by President Reagan, changed the "termination" into a "suspension." While it is difficult to fathom any practical modification resulting from the change in terms, see discussion at pp. 31–33, *supra,* the government argues that this change has constitutional significance. Whether it does or not, there is no doubt that President Reagan could modify President Carter's order.

I agree that an executive agreement may have the impact of a treaty for some purposes, but it does not follow that an executive agreement is "the law of the land." No matter how much the government might wish that the executive agreement was "the law of the land" nor how often it misuses that term, it cannot by such argu-

ment without more render the particular executive agreement constitutional. Save for the decisions of courts in other circuits in this very crisis situation, all of the cases and commentaries pointed to by the government and the defendants involve situations which antedated the passage of the FSIA.

Prior to the enactment of that statute we were in the position described in the second category of situations set forth by Justice Jackson in his concurring opinion in *Youngstown, supra, viz.,* a situation where "congressional inertia, indifference or quiescence may sometimes, at least as a practical matter, enable, if not invite, measures or independent presidential responsibility." *Id.* We are no longer in that "twilight zone." Congress has spoken in the FSIA, and what may have been good precedent before the passage of that statute is not necessarily binding now.

### 3. Separation of Powers

The lack of judicial precedents for terminating United States citizens' commercial claims against instrumentalities of foreign nations and transferring them to a tribunal, however, is but one of the problems facing the President's exercise of power in this case. More serious is the transgression by the President of constitutional functions entrusted to other branches of the government. The power to determine the jurisdiction of the courts has been allocated solely to the Congress. U.S.Const. Art. II, § 1. The Congress has acted affirmatively by conferring jurisdiction on the United States courts to adjudicate international commercial claims such as that involved in the instant case. It would indeed be incongruous if the executive department alone, without even the limited participation by Congress when a treaty is ratified, could nullify the act of Congress giving the courts jurisdiction of such commercial claims and do away with the constitutional rights of citizens to bring suit in a federal court to enforce their rights under a contract. *See Youngstown,* 343 U.S. at 586, 72 S.Ct. at

---

**21.** *See* Borchard, *Treaties and Executive Agreements—A Reply,* 54 Yale L.J. 616, 628 (1945).

866; *United States v. Guy W. Capps, Inc.*, 204 F.2d 655, 658 (4th Cir. 1953), *aff'd on other grounds*, 348 U.S. 296, 75 S.Ct. 326, 99 L.Ed. 329 (1955) (executive agreement inconsistent with prior act of Congress struck down); *Seery v. United States*, 127 F.Supp. 601, 606 (Ct.Cl.1955) (executive agreement cannot nullify right to sue United States for compensable taking). It would be "manifestly contrary" to the objectives of the Framers of the Constitution to construe Article II as permitting the President to exercise such power under an executive agreement without observing the balance of powers embodied in the Constitution. *See Reid v. Covert*, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957).

An argument was advanced by the government at an earlier point in these proceedings that this court, by insisting that the judicial branch has jurisdiction over the controversy between Marschalk and Iran Air, is usurping the President's exclusive power to conduct foreign affairs and set foreign policy for this country. I disagree. If there has been any interference by one branch of our government with the constitutional powers of another branch it is the exact opposite of what the Executive has claimed. Marschalk's claim against Iran Air did not arise in any foreign affairs context. The claim is purely and simply commercial in nature. The claim arose because Marschalk performed services wholly within the territory of the United States pursuant to contract. The benefit conveyed by Marschalk to Iran Air was a potentially greater market share in the United States. If Iran Air were purely a private corporation, there would be no doubt that its debt to Marschalk would be a simple civil suit in which the executive department would have no interest. The FSIA and the Treaty of Amity both indicate that for purely commercial claims such as this, both Iran and the United States had agreed to treat such actions as if they were simple civil suits even though they involve an instrumentality of the Government of Iran.

The only thing which involved this law suit with the foreign affairs or foreign policy of this country was the Agreement and the Presidential Orders which used this litigation as a negotiating chip and a means of paying ransom to obtain the release of the hostages. This involvement of private claims in diplomacy is just the type of action which Congress sought to foreclose by passage of the FSIA.

As noted earlier, prior to the FSIA, courts would generally defer to suggestions of immunity from the executive branch. In 1976, Congress deemed it wise to prohibit any executive interference on such decisions; it did not even give the executive limited powers in the event of emergencies to intervene in the jurisdiction of the courts. This was not an oversight but an intentional choice by Congress. No authority has since been given to the President under IEEPA or any other statute to interfere with the jurisdiction of the courts over commercial claims against foreign defendants. See discussion at pp. 78–85, *supra*.

To find that a President, by virtue of his foreign affairs power, can dictate the jurisdictional bounds of United States courts violates both the words and the objectives of our Constitution. The Constitution is neither silent nor equivocal about who has the authority to legislate the jurisdiction of the courts. The Founders of this Nation entrusted that responsibility to the Congress. The Constitution does not subject this congressional power to presidential control in times of crisis.

The government and the defendants charge that other Presidents settled private claims against foreign nations without congressional authority. Congress, however, did not thereby lose its exclusive constitutional authority to make laws regarding the jurisdiction of the courts, *see Youngstown*, 343 U.S. at 588, 72 S.Ct. at 867, and furthermore spoke its will definitively in the FSIA since the cited actions took place.

In short, by terminating the legal proceedings involving Marschalk's claim against Iran Air and the Government of Iran, the President invaded the jurisdiction of Congress and the judicial branch and

violated the separation of powers. Accordingly, the President's actions in terminating these law suits cannot be sustained since they were beyond his constitutional powers.

There remains the question whether the actions of the executive department constitute a "compensable taking" as that term is understood in the law, and it is to that which I now must turn.

### C. Fifth Amendment Taking Of Marschalk's Claim

Marschalk also challenges the termination of legal proceedings in the United States courts and the transferral of its claim to an international tribunal on Fifth Amendment grounds. Marschalk argues that the President's actions with respect to its claim constitute a taking of private property for a public purpose without just compensation and a denial of its right of access to the United States courts.

### 1. Constitutional Limits On Executive Power

■ It is a basic tenet of constitutional law that the Congress and the President, in exercising power, must act in accordance with all the limitations imposed by the Constitution. *Reid v. Covert*, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957). This principle applies to exercises of power in both domestic and foreign affairs arenas. *Id.*

Thus, when faced with a treaty that abrogated individual constitutional rights, the Supreme Court struck it down. *Id.* At issue in *Reid* was the constitutionality of a treaty between the United States and Great Britain which permitted United States military courts to exercise exclusive jurisdiction over offenses committed in Great Britain by American servicemen and their civilian dependents. The military trial of civilians was challenged on the grounds that the accused is not given trial by jury or other Bill of Rights protections. The Court held that the prohibitions of the Constitution were designed to apply to all the branches of the government and cannot be nullified by the President and Senate combined. *Id.*

at 6, 77 S.Ct. at 1225. If the President and the Senate must abide by the Constitution when executing treaties, there can be no doubt that the President acting alone, without even the consent of the Senate as when a treaty is ratified, cannot exercise power under an international executive agreement without observing constitutional prohibitions.

The Fifth Amendment states, in part, "No person shall ... be deprived of life, liberty, or property, without due process of law; nor shall private property be taken without just compensation." Of course, the President or the Congress must have the authority to take the particular property and the individual must be compensated for the fair market value of the loss. I have already discussed at length my conclusions that the President had neither the congressional nor constitutional authority to take plaintiff's contract claim and use it to negotiate the release of the hostages. For purposes of this discussion, however, it will be assumed that the President was so authorized. Thus, the focus of this section will not be on the authority for the President's actions but on whether his actions with respect to Marschalk's claim constituted a taking which requires compensation under the Constitution.

### 2. The Agreement and Executive Order No. 12,294

■ The government suggests that the executive order issued by President Reagan did not terminate the lawsuits. Rather, it argues, "here the President has taken the *lesser* measure of suspending claims until final disposition through the arbitral proceedings. Accordingly, no 'rights' of any plaintiff have been affected ...." Brief for Government at 26–27. The government further urges that all claims are the sole property of the United States and can be presented by the government to the Tribunal even over the objection of the original citizen owner. *Id.* at 16 citing 8 Whiteman, *Digest of International Law*, at 1224 (1967).

The distinction between "terminating" law suits such as this or merely "suspend-

ing" them is unclear. *Compare* Agreement *with* Executive Order No. 12,294. As I stated earlier, there is no practical difference in my mind. See discussion at p. 83, *supra.* Under Section 4 of Executive Order No. 12,294, 46 Fed.Reg. No. 14,111 (1981) "[a] determination by the . . . Tribunal on the merits . . . shall operate as a final resolution and discharge of the claim for all purposes." The only provision for a lifting of the suspension concerns those cases where the Tribunal determines "that it does not have jurisdiction over such claim . . . ." Section 3, Executive Order No. 12,294, *supra.* Commercial claims, like Marschalk's, clearly fall within the Tribunal's jurisdiction.

Despite the finality of the Tribunal's determinations, the government maintains that the litigation of the claims has not been terminated in the United States courts. While claiming that no rights of any plaintiff have been taken, it states that "if any plaintiff believes that the exercise of these powers [by the President] with respect to its claims result [sic] in a taking of property, it is free to seek compensation in any forum it wishes, to the extent Congress has provided a remedy, but any such remedy does not include interfering with the President's authority to settle claims." *Id.* at 27–28. The government does not point to any statute whereby "Congress has provided a remedy." The argument ends with a total disclaimer that the United States government is liable for any "taking requiring compensation." Brief for Government at 28.

### 3. Taking of Marschalk's Claim

There can be no doubt that extinguishing Marschalk's right to enforce its contract claim against Iran Air and Iran in the United States courts constituted a taking. Valid contracts like Marschalk's and the rights arising out of such contracts are property and protected by the Fifth Amendment. *Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1933); *United States v. Northern Pacific Ry. Co.*, 256 U.S. 51, 64–67, 41 S.Ct.

439, 441–42, 65 L.Ed. 825 (1921). When the right to enforce a contract in the United States courts is taken away or materially lessened, the contract and the rights thereunder are taken within the meaning of the Constitution. *Lynch v. United States*, 292 U.S. at 580, 54 S.Ct. at 844; *Seery v. United States*, 127 F.Supp. 601 (Ct.Cl.1955); *Gray v. United States*, 21 Ct.Cl. 340 (1886). *See also National Airmotive Corp. v. Government of Iran*, 499 F.Supp. 401, 406 (1980).

It is equally clear that Marschalk is entitled to compensation for the rights it lost under the Agreement and the Executive Orders. In requiring that those parties who are singled out to make a sacrifice for the public good be compensated, the Fifth Amendment undertakes to redistribute certain economic losses inflicted for the public good so that they will fall upon the public rather than wholly on those individuals whose property is taken. *United States v. Willow River Power Co.*, 324 U.S. 499, 65 S.Ct. 761, 89 L.Ed. 1101 (1945).

The government argues, however, that Marschalk received a fair trade in this case. In exchange for loss of Marschalk's right to enforce its contract claim in the United States courts, the government has offered to have Marschalk's claim adjudicated by an international arbitral tribunal. The government also claims that Marschalk will have a better chance of prevailing on its claim than it had before the United States courts because Iran has waived any sovereign immunity or act of state defenses it might have. I disagree and find that Marschalk suffered an uncompensated loss of its right to adjudicate its claims before the United States courts.

Marschalk gains nothing by the alleged waiver by Iran of sovereign immunity or act of state defense. Under the FSIA and the Treaty of Amity, Iran is not entitled to those defenses in the United States courts when the proceedings involve a commercial claim. Furthermore, Marschalk loses a great deal in the trade. Marschalk must now pursue its claim in a foreign country which will undoubtedly increase the time and expense involved in the suit. More

importantly, Marschalk must litigate its claim before an overtly political Tribunal without our constitutional guarantees of due process. If Marschalk wins at the Tribunal, it may recover no more than 20 cents on a dollar. If Marschalk loses, it will have no right of appeal.

There is no mention in the Agreement or the Executive Orders which provides for any compensation for Marschalk or any other claimant. Nor is there any remedy for them available under the Tucker Act, 28 U.S.C. § 1491, *et seq.* (1976 & Supp. III 1979), which I will discuss later. Accordingly, I hold that the Agreement and the Executive Orders violate the Fifth Amendment by taking private property for a public purpose without just compensation.

## II. Nullification Of The Attachments

The next issue raised by the executive agreement with Iran is whether the nullification of Marschalk's attachment constitutes a valid exercise of Presidential authority, and if so, whether a compensable taking has occurred. Before addressing these issues, a few observations regarding the creation of Marschalk's attachment and its validity are in order.

### A. *Marschalk's Attachment Was Valid When Made*

To reiterate some of the pertinent facts of the instant case, as a result of the President's Order freezing Iranian assets in this country, the Secretary of the Treasury promulgated regulations which permitted certain plaintiffs to commence law suits against Iran and to obtain pre-judgment attachments. The regulations specifically prohibited, however, any claimants from obtaining a judgment.[22]

22. For text of pertinent Treasury Regulations see notes 6 & 7, *supra.*

23. C.P.L.R. § 6211(b) states:
    An order of attachment granted without notice shall provide that within a period not to exceed five days after levy, the plaintiff shall move, on such notice as the court shall direct to the defendant, the garnisheè, if any, and the sheriff, for an order confirming the order of attachment. If plaintiff fails to

On December 28, 1979, Marschalk obtained *ex parte* orders of attachment from this court in accordance with New York law and the recently enacted Treasury regulations. Thereafter, Marschalk filed a bond as required. On January 2, 1980, Marschalk then served notices of levy and copies of the order of attachment on numerous New York banks holding the frozen Iranian deposits. Four days later Marschalk moved for an order to confirm the attachments in accordance with § 6211(b) of the C.P.L.R.[23] Meanwhile, the Treasury regulations which permitted the pre-judgment attachments specifically prohibited the delivery to or seizure by the Marshal of the Iranian assets. 31 C.F.R. § 535.418. Custody by the Marshal would be the final step in fully executing the orders of attachment. *See* C.P.L.R. § 6214(c). Thus, Marschalk did all it could under the circumstances to execute its interest in the attachment. In an opinion dated September 26, 1980, I addressed Marschalk's motion to confirm the attachments along with similar motions brought in 96 other cases pending before my brethren in this district. *See* 502 F.Supp. 120 (S.D.N.Y. 1980). In that decision, the validity of the attachment orders and levies was found not to be affected by the doctrine of sovereign immunity. In essence, I determined that the President's Order freezing the Iranian assets in this country removed Iran's immunity from pre-judgment attachments.

Final confirmation of the attachment, however, was not made in that opinion. Under New York law, in order to confirm an attachment, the plaintiff bears the burden of establishing that (i) the attachment is based upon proper grounds; (ii) there is a continuing need for the levy; and (iii) that

make such motion within the required period, the order of attachment and any levy thereunder shall have no further effect and shall be vacated upon motion. Upon the motion to confirm, the provisions of subdivision (b) of section 6223 shall apply. An order of attachment granted without notice may provide that the sheriff refrain from taking any property levied upon into his actual custody, pending further order of the court.

there is a probability that plaintiff will succeed on the merits of the underlying claim. N.Y.C.P.L.R. §§ 6211(b), 6223(b) (McKinney). My opinion dated September 26, 1980 found that plaintiffs had sustained their burden in establishing the first two requirements. 502 F.Supp. at 132–133. A finding of probability of success on the merits was deferred so that the individual judges to whom the cases had been assigned could make the determination in light of the particular facts of each individual case. The recent remand by the Second Circuit, however, has obligated me to make that determination in this case.

Although the doctrine of sovereign immunity posed no bar to the pre-judgment attachment due to the Presidential freeze order, it is important to note that the Treasury Regulations promulgated after the freeze order specifically authorized the attachments. Marschalk's attachment was authorized by the Treasury regulations. Thus, there is no question that Marschalk's *ex parte* order of attachment issued by this court was valid under applicable law and was a proper exercise of this court's jurisdiction.

In its brief, the government asserts that the President has the authority to use blocked funds "as a negotiating chip with a foreign country." Brief for Government at 37. The rationale for blocking the funds obviously was not only to protect United States claimants, but also to provide a bargaining chip for negotiating the hostages' release. The reasons behind the promulgation of the regulation permitting the attachments, however, are not entirely clear from the events surrounding this litigation. Although the express authority to obtain pre-judgment attachments may have been an effort to afford United States claimants further protection, it undeniably produced another bargaining chip for the State Department. With the attachments in place, not only did the freeze order stand between the Iranians and their fortune in America, the attachments were also an obstacle.

As earlier described, on January 19, 1981, the President entered into an agreement with Iran and issued an executive order which *inter alia* nullified the orders of attachment and transferred a portion of the attached Iranian assets out of this country for eventual return to Iran. The agreement which won the precious freedom of fifty-two Americans, however, did more than return Iran's assets; it also abrogated the interests that citizens of the United States had acquired in those assets by attachment. It is this fact which requires me to do more than perfunctorily review and uphold the constitutionality of this element of the executive agreement with Iran.

The Iranian defendants and the Government of the United States now move to vacate the orders of attachment arguing that the executive order is the only applicable law. Two issues emerge: whether the nullification of attachments was within Presidential authority, and if so, whether the nullification constitutes a taking of a property interest by the government for which the plaintiffs are entitled to just compensation under the Fifth Amendment.

### B. *Presidential Authority*

■ The government argues that the President's authority to nullify the attachments exists apart from Article II of the Constitution [24] and is contained in IEEPA which provides, in part, that in a national emergency a President may "direct and compel, nullify, void, prevent or prohibit any ... holding ... or exercising any right, power, or privilege with respect to, or transactions involving any property in which any foreign country or a national thereof has an interest." On its face, this language could be construed to authorize the President to nullify any right to Iranian property in this country. Marschalk's attachment is a right, although presently in-

---

**24.** The government also argues that the President's power to suspend claims under Article II would necessarily include the power to nullify attachments. In view of my finding that the President does not have the constitutional authority to suspend claims, this argument is unavailing.

choate, in Iranian property. A reading of the legislative history underlying IEEPA, however, reveals that the powers conferred under it do not include nullification of rights such as that which Marschalk has in Iranian property located in this country.

The exact words found in 50 U.S.C. § 1702(a)(1)(B) (Supp. III 1979) were taken from IEEPA's predecessor, TWEA. Unfortunately, when Congress enacted IEEPA in 1977, it did not state what was intended to be the policy or purpose of the inherited section. We must look therefore to TWEA and cases which relied on it to determine what Congress intended by the language invoked here. Before doing so, it is important to note that IEEPA was created "to revise and delimit the President's authority to regulate international economic transactions during wars or national emergencies." IEEPA S.Rep. at 2. IEEPA specifically excluded portions of § 5(b) which authorized the President to (i) vest property, "i. e., to take title to foreign property; (ii) the power to regulate purely domestic transactions;[25] (iii) the power to regulate gold or bullion, and (iv) the power to seize records." IEEPA H.Rep. at 15. The portion of the legislative history of IEEPA that refers to the subsection invoked here describes only the grant of authority to the President "to control or freeze property transactions where a foreign interest is involved . . . ." IEEPA S.Rep. at 5.

Turning to the legislative history of TWEA, Congress limited its explanations of that statute to the Presidential power to vest property and to regulate transactions between United States nationals and foreigners. These powers are consonant with the original purpose of TWEA—"to define, regulate, and punish trading with the enemy." H.Rep.No.4960, 65th Cong., 1st Sess., P.L. 91, 40 Stat. 411 (1917). Neither the legislative history of TWEA nor any case falling under it indicate a presidential power to nullify a citizen's court-conferred rights in foreign property.

The government cites *Orvis v. Brownell*, 345 U.S. 183, 73 S.Ct. 596, 97 L.Ed. 938 (1953), for the asserted proposition that TWEA permitted the President to nullify attachment liens in foreign property obtained by United States citizens. The government argues that since IEEPA took away only the President's power to vest property, the power to nullify attachments, like those in *Orvis*, survives. *Orvis* is distinguishable, however, from the situation at bar and does not stand for the proposition advanced by the government. In *Orvis*, the President issued a freeze order on all Japanese property in this country. Eleven days later, the plaintiffs obtained attachment liens and thereafter default judgments. The President then vested all the Japanese property in the United States. The plaintiffs tried to enforce the attachment liens against the United States as custodian of the property.

The Supreme Court held that the attachment liens obtained after the freeze order would be recognized insofar as they determined the relationship between creditor and enemy debtor. The attachment did not, however, permit the transfer of a property interest in the blocked funds which could be asserted against the United States. The Court specifically stated that the issue was *not* whether a lien could be annulled by the President, "but rather whether the freezing order prevented the subsequent acquisition, by attachment, of such a property interest as the Custodian would have to recognize . . . ." 345 U.S. at 188, 73 S.Ct. at 598. The freeze order had prevented any "transfer" of property interest. Since the attachment was a transfer of a property interest, it was not valid if granted after the freeze order.

In the situation at bar, the President granted a license to plaintiffs to obtain pre-judgment attachments. Clearly, the transfer of interest by way of attachment was not prohibited as it was in *Orvis*. More significantly, the *Orvis* case involved assertion of rights against the United States. It

---

**25.** Footnote 23 of the House Report states: "Examples of purely domestic transactions which in the past have been regulated under § 5(b) include hoarding of gold by United States citizens and the extension of consumer credit by United States citizens."

was explicitly found by the Supreme Court that the attachments remained enforceable by the creditor against the debtor. *Id.* at 186–87, 73 S.Ct. at 597–98. The enforcement of those rights against the United States is obviously a different matter because of the government's sovereign immunity. In the present case, the government did not vest the Iranian assets and Marschalk is not seeking to enforce their attachments against the United States. Rather, Marschalk is asking for the preservation of an existing court-conferred interest in assets which are about to be returned to the debtor. Under *Orvis*, Marschalk is entitled to this.

Despite the lack of judicial precedents and evidence of legislative intent, the language contained in IEEPA and its predecessor TWEA does appear to grant the power to nullify any interest in foreign property held by any person. Justice Frankfurter's observations about TWEA are appropriate here: "Instead of a carefully matured enactment, the legislation was a makeshift patchwork. Such legislation strongly counsels against literalness of application. It favors a wide latitude of construction in enforcing its purposes." *Guessefeldt v. McGrath*, 342 U.S. 308, 319, 72 S.Ct. 338, 344, 96 L.Ed. 342 (1952).

It is evident that the relevant language in IEEPA was intended to give the President the power to nullify a United States national's interest in foreign property located in this country when the acquisition of that interest interfered with the President's efforts to resolve a "national emergency." Traditionally, this would apply to a transaction with the enemy which occurred after an emergency had been declared. Thus, the President clearly has the power to nullify an interest in Iranian property located here which was obtained by a United States citizen through a transaction with the Iranian owner after an executive freeze order. It is equally clear that Congress did not envision the President nullifying an interest in Iranian property which was validly conveyed by a federal court. The attachments here were created by a federal court and not through a transaction with the Iranians.

Moreover, the attachments were expressly permitted by the Executive and thus do not constitute a transfer of Iranian property in contravention of the freeze order.

The specious nature of the government's argument that the President, under IEEPA, can take any property in which Iran has an interest can be shown by taking the next logical step. Under the government's view, if Iran obtained an attachment against property owned by a United States citizen then in the event of a national emergency the President under the IEEPA could nullify the citizen's rights in his property simply because it was "property in which a foreign country ... has an interest." I refuse to read the IEEPA so broadly because Congress clearly did not intend for the President to tread upon citizen's rights to their own property in this country.

This leads to another argument advanced by the government which states that the license to obtain attachments was revocable, thus giving the President implicit power to nullify the attachments by way of revoking the license. This argument is unavailing for two reasons. First, nothing in the regulations permitting the attachments says that the attachments would be subject to the continued pendency of a general license permitting United States claimants to obtain new attachments. Second, as will be discussed later, interests acquired by way of a revocable license remain vested in the licensee despite revocation of the license and the resulting preclusion from obtaining any additional interests.

Despite its ambiguities, the legislative history of IEEPA clearly shows that Congress was attempting to limit the powers of the President which existed under TWEA. Aside from the specific powers already mentioned that were removed by IEEPA, Congress was obviously aware of the existing constitutional limits on Presidential power. This includes not only the doctrine of separation of powers but also individual freedoms guaranteed by the Bill of Rights. For example, the House Report states that although "the purpose of the legislation [is]

98

to authorize tight controls in time of national emergency, these controls should not extend to the total isolation of the people of the United States from the people of other countries ... such isolation can ... entail violation of First Amendment rights of freedom of expression...." IEEPA H.Rep. at 11. Although Congress didn't expressly discuss the Fifth Amendment, clearly it too would limit the President's authority under IEEPA. Thus, even assuming IEEPA expressly authorizes the nullification of attachments, that authority is limited by claimant's Fifth Amendment rights to due process and to just compensation if private property is taken for public use. As a result, if no compensation is provided by the United States, the President's actions in attempting to void the attachment in this case are invalid as violative of the Fifth Amendment.

C. *Taking of Property Rights and Compensation*

■ Under the Fifth Amendment, private property cannot be taken for public use, without just compensation. The first issue which arises is whether the attachment obtained by Marschalk is a compensable property interest. As earlier stated, the attachment is a creature of state law. Nevertheless, it is properly enforceable in federal court, *see* Fed.R.Civ.P. 64, and is expressly referred to in the FSIA. *See* 28 U.S.C. § 1609, § 1610 (1976). The government's argument that because attachments are not derived from federal law but arise from state law the interests therein are "subordinate to our international obligations pursuant to executive agreements," brief for Government at 29–30, displays a complete misunderstanding of the government's constitutional obligations. The compensability of a property interest does not depend upon whether the interest was created by state or federal law. Indeed, the meaning of property under the Fifth Amendment, although a federal question, will normally obtain its content by reference to local law. *United States v. Causby,* 328 U.S. 256, 266, 66 S.Ct. 1062, 1068, 90 L.Ed. 1206 (1946).

■ Under the law of New York, when a levy is made under an order of attachment, a lien is created in favor of the creditor upon the property attached. *West Virginia Pulp & Paper Co. v. People's Home Journal, Inc.,* 233 App.Div. 376, 253 N.Y.S. 178 (1st Dep't 1931). As earlier described, a levy has been made by Marschalk insofar as possible, and thus, a lien was created.

Nullification of this lien is analogous to the destruction of a materialman's lien which took place in *Armstrong v. United States,* 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960). There, the plaintiff supplied building materials to a shipbuilder who had contracted with the government to build eleven navy personnel boats. When the shipbuilder defaulted on the contract with the government, the government took title to all of the manufacturing materials as provided in the contract. This made the plaintiff's lien unenforceable. The Court held this constituted a taking for which compensation was due under the Fifth Amendment.

A similar result was obtained in *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1936). There, a bank acquired a mortgage which under state law constituted a lien enforceable only by suit to foreclose. Subsequently, Congress amended the Bankruptcy Act in an attempt to deprive mortgagees of substantial incidents of their rights with respect to mortgaged property. The Court held that the bank's property had been taken without just compensation in violation of the Fifth Amendment.

The government insists that any rights obtained by the attachments on Iranian assets were conditional because they were obtained pursuant to a revocable license. The Executive Branch refuses to consider the license granted by the executive pursuant to which the attachments were made as anything other than a "revocable," "conditional" and naked "license." In so doing, reference is made to cases dealing with such licenses. But this ignores the fact that the license granted, although conditional and

revocable, is not "naked." The license with which we are dealing here permitted the plaintiffs to obtain a property right prior to its revocation.

This distinction is more easily seen by example. If the federal government grants its citizens a revocable license to go on land owned by the federal government to enjoy the scenery and thereafter revokes the license, the citizens were merely enjoying a naked revocable license. But the same result does not obtain where, for example, the revocable license is granted to mine a precious metal on federal land. If a citizen is lucky enough to discover, mine and extract the metal, then when the license is revoked, the government can prevent further mining. It would appear, however, that the mere revocation of the license would not entitle the government to take the precious metal already extracted from the citizen without recompense. In the latter case, there is a license which permitted a citizen to obtain property rights. Such a license may clearly be revoked, but such revocation means only that no future property interest may be obtained by a citizen. The revocation does not in and of itself destroy property rights already acquired by a citizen.

Another case cited by the government, *Acton v. United States*, 401 F.2d 896 (9th Cir. 1968), *cert. denied*, 395 U.S. 945, 89 S.Ct. 2018, 23 L.Ed.2d 463 (1969), does not militate against this proposition. There, the plaintiff was issued an exploration permit by the Atomic Energy Commission for the purpose of prospecting for and developing uranium ore reserves. The permit provided that the government "shall have the right to withdraw this right of entry either in whole or in part at any time." *Id.* at 898. The plaintiff sought recompense for not being allowed to continue entry on the government property for prospecting purposes. No attempt was made by the government to take the plaintiff's rights to any uranium actually mined.

Nor does the decision in *Isthmian Airways, Inc. v. United States*, 94 Ct.Cl. 598 (1941) support the government's argument. There, the plaintiff was issued a revocable license to occupy certain land and erect hangers and shops to be used in operating an airline. In fact, the situation was more of a "leasehold" than a "license" for the agreement required the plaintiff to pay "a rental of $100 per year." *Id.* at 599. The plaintiff breached its commitments and the "license" was terminated. The court rejected the plaintiff's claim for compensation citing the revocable nature of the license. It is interesting to note, however, that the government did not seek to oust the plaintiff of whatever property rights it had in the improvements, but rather, the government required the plaintiff to remove these improvements.

The government also relies on the decision in *United States v. Fuller*, 409 U.S. 488, 93 S.Ct. 801, 35 L.Ed.2d 16 (1973). That case involved the revocation of a license to permit grazing of livestock on federal lands. The court held that the licensee could no longer have his livestock graze on the land. It did not mean that the licensee had to turn back to the government the extra weight or growth the livestock had garnered while grazing on federal land nor the profit which might have been gained thereby. The government could not seek such relief in the *Fuller* case because the licensee had obtained a proprietary interest in the growth of the animals.

Yet, the abolition of such a proprietary interest is exactly what the government seeks here. Under the terms of the license herein, plaintiffs were permitted to obtain pre-judgment attachments. No conditions were placed on this license other than the fact that the license could be revoked and future attachments prohibited. Thus, the government cannot freely take plaintiffs' attachments anymore than it could take away a miner's property interests in minerals which were already mined under a revocable mining license.

Moreover, in obtaining the attachment it cannot be denied that Marschalk expended large sums of money on attorneys' fees and in obtaining the bond required by New York law. In so doing, it is clear that Marschalk had a reasonable expectation

that by relying on the government's action, it would not thereafter have its rights to the attachment nullified by another government action. To argue otherwise means that the government was using the rights and fortunes of individual citizens to create merely another bargaining chip to use in international negotiations.

■ Thus, by nullifying Marschalk's attachment, the President has taken a valid property interest belonging to Marschalk for which compensation is due. An attachment constitutes security for payment of a debt if a debt is found to exist. *See Reich v. Spiegal*, 208 Misc. 225, 140 N.Y.S.2d 722 (Sup.Ct.1955). The Fifth Amendment obligates the government to provide a similar type of security as compensation. Marschalk and the other plaintiffs are entitled to be put in as good a position as they would have been in if the attachments were not nullified. *See United States v. Miller*, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943). Like a materialman's lien, an attachment is an inchoate security interest. Thus, any substitute for the attached Iranian assets would make the plaintiffs whole provided the substituted assets were equal in value to the value of the attachments. The fund created by the executive agreement with Iran from which claims are to be paid, however, is made up of a small fraction of the assets originally attached just in this jurisdiction. Although it is true that, under the Agreement, there is a promise that the fund is to be replenished by Iran, that depends wholly on the cooperation of the Iranians. Should this cooperation not be forthcoming, Marschalk's recovery might well be uncollectable. This is in sharp contrast to the situation as it now stands. Should Marschalk obtain a judgment under the present circumstances, that judgment can be paid fully from the attached assets. As a result, a compensable taking has occurred.[26]

26. The conclusion that a taking presently exists for which compensation is due differs from that arrived at in *American International Group v. Iran*, 657 F.2d at 449 (D.C.Cir.1981) and *Chas.*

### Implications of the Tucker Act

■ From what has been said, it follows that the President's agreement with Iran takes valid property interests away from Marschalk for an important public purpose—securing freedom for fifty-two Americans. This taking was achieved, however, without any explicit provision for compensation. Some of the claimants have suggested that the Tucker Act might be invoked to provide compensation to the claimants. Under the *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), jurisdiction in the Court of Claims under the Tucker Act, 28 U.S.C. § 1491 *et seq.* (1976 & Supp. III 1979), is to be presumed for claims arising *inter alia* under the Constitution, an act of Congress or an executive regulation. This presumption of availability of a remedy against the United States exists unless Congress specifically precludes it. 419 U.S. at 126, 95 S.Ct. at 349. Here, there is nothing in the executive orders which expressly precludes a Tucker Act remedy. Also, nothing in IEEPA excludes the Tucker Act's application. As a result, it would appear at first blush that a Fifth Amendment problem could be averted by plaintiffs bringing suits in the Court of Claims.

Unfortunately, Marschalk's claim for the taking of its claim in this court against the defendants and the nullification of its attachment is precluded by the treaty exception to the Tucker Act, 28 U.S.C. § 1502 (1976) which states:

Except as otherwise provided by Act of Congress, the Court of Claims shall not have jurisdiction of any claim against the United States growing out of or dependent upon any treaty entered into with foreign nations.

Marschalk's taking claim is directly based on the President's actions pursuant to an executive agreement with Iran. International executive agreements are treated the same as treaties for purposes of this section.

*T. Main International, Inc. v. Khuzestan Water and Power Authority,* 651 F.2d 800, 813 (1st Cir. 1981).

*See Hughes Aircraft Co. v. United States*, 534 F.2d 889, 903 (Ct.Cl.1976); *see also, Yassin v. United States*, 76 F.Supp. 509, 517 (Ct.Cl.1948). The executive agreement removes Marschalk's claim from the United States courts and eliminates its security interest represented by the attachments. Thus, the government's constitutional obligation to provide compensation to Marschalk directly results from international executive agreements and therefore cannot be determined by the Court of Claims. *See Eastern Extension Australian and China Telephone Co. v. United States*, 231 U.S. 326, 34 S.Ct. 57, 58 L.Ed. 250 (1913).

Thus, there is no Tucker Act remedy available to Marschalk. As earlier discussed, the Agreement and the orders and regulations promulgated thereunder are silent as to compensation. There is no other place from which compensation can be made. For this reason, regardless of the basis of authority for the President's action, the Agreement and the orders promulgated thereunder are invalid as violative of the Fifth Amendment.

Thus, due to the invalidity of the Agreement and executive orders promulgated thereunder, there is no bar to the continuation of these proceedings and to the confirmation of Marschalk's attachment. I now turn to the only remaining issue before me: whether Marschalk has demonstrated a likelihood of success on the merits sufficient to establish a basis for confirming the attachments under New York C.P.L.R. § 6211(b).

### Confirmation

A hearing was held on June 5, 1981, at which the following facts were proved. Marschalk had a written contract with Iran Air which obligated Marschalk to provide advertising services in the United States on behalf of Iran Air. The contract was made effective from August 15, 1978 for a period of one year and thereafter until one of the parties gave three months notice of termination. The contract itself was signed by the parties when Richard Vallenti, Senior Vice President of Marschalk, went to Teheran for an orientation meeting primarily designed to acquaint him with the services which Iran Air offered and the country itself. All negotiations for the contract took place in New York, and indeed, Marschalk had already been informed by letter from Iran Air's New York office that it was appointed to be Iran Air's advertising agent in the United States.

Pursuant to the contract, Marschalk proposed and placed printed advertising in various markets in the United States. Marschalk sent invoices covering publishing costs and other services on a monthly basis. Bills were forwarded to Iran Air at its New York office in the same month an advertisement appeared in a publication. Payments were made on a somewhat irregular basis by checks drawn on Iran Air's account at Bankers Trust Company in New York. These payments continued intermittently until October 3, 1979.

On November 30, 1979, Marschalk sent to Iran Air a statement of account showing all of the payments due as of that date. No protest has ever been made as to this account stated by Iran. Marschalk continued to send bills to Iran Air as they were received from the publishers. One invoice was paid by Iran Air as late as January, 1980 (after this lawsuit was started), however, no payment has ever been made on invoices that are the bases of this lawsuit. At no time did Iran Air in any way protest any bills sent or the account stated by Marschalk, nor did Iran Air ever object to Marschalk's performance under the contract.

No defense for non-payment of the account stated was offered by the defendants at the hearing.

On the basis of the record as a whole, I am constrained to find that Marschalk has established the requisite probability of success on the merits of their claim and therefore their attachment is confirmed.

Certain Iranian banks also appeared at the hearing and sought to have the attachment vacated as to their assets or accounts. It was clear that this motion came as a surprise to the attorneys for the plaintiff.

The record in this particular matter is unclear as to the exact status of these banks, particularly in view of a nationalization decree issued some time ago by Iran. It is unnecessary to decide this specific motion at this time, particularly in view of the state of the record. A motion under C.P. L.R. § 6223 to vacate an attachment remains available to these Iranian banks at any time until execution of a judgment. Accordingly, this motion is denied without prejudice to be renewed only after a proper record is made, including if necessary some limited discovery.

Before closing, I wish to add a few general observations. Perhaps, it would have been more felicitous for this court merely to adopt the reasoning proffered by the government. That could have eventually led to a quick and facially clean resolution of the knotty problem presented by the instant situation. The Constitution, however, will not allow it. My responsibility to future generations and the continuation of constitutional government in this country will not allow it.

The Presidents are not to be condemned for the actions they took, for among the prime benefits obtained was the release of those held as hostages. Now that the hostages have been released and the crisis no longer burns hot, a calm and dispassionate review is possible.

The executive claims that it needs "flexibility," but it is not for me to supply "the flexibility" which the executive seeks. That power cannot come from the courts. Judges must deal with the laws as they find them.

Accordingly, Marschalk's motion to confirm its attachment is granted. The motions by the defendants and the government to vacate the attachment are denied. The defendants' motion to dismiss the action is denied. The government's motion to place the action on the suspense docket of this court is denied. The motion by certain Iranian banks to release certain portions of the attachment is denied without prejudice.

The question posed by the Court of Appeals as to whether the President was acting within his constitutional and statutory powers when he entered the Agreement and issued Executive Orders to effect the release of the American hostages must be answered in the negative at least insofar as they purport to affect this litigation.

The Court of Appeals has retained jurisdiction in this matter. The parties are directed to make application within two days of the date hereof for whatever appointment is necessary with the Clerk of the Court of Appeals for scheduling purposes.

SO ORDERED.